Filed 9/24/25  In re Alex G. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ALEX G. et al., Persons Coming Under the Juvenile Court Law. | B342720 (Los Angeles County Super. Ct. No. 22CCJP00379A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ALEXANDRA G., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Alexandra G. (mother) appeals from orders terminating her parental rights to her children Alex G. (born April 2015) and Sophie G. (born December 2022). Mother contends the juvenile court erred in finding she failed to show the beneficial parental relationship exception to termination of parental rights found in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) applied.[1] We find no error and affirm the orders.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

### Initial referral and investigation

On January 18, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging mother and father engaged in a physical altercation in the presence of Alex.[2] Mother was allegedly using methamphetamine, marijuana, and alcohol, and failing to provide for Alex's needs. The reporting party indicated mother does not feed Alex or take him to school, and Alex does not bathe for three to four days at a time.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] While the record states the day of the referral was in 2021, we assume this to be an error as all other dates are in 2022.

2

Mother lived with Alex, maternal great-grandmother (MGGM), maternal great-grandfather (MGGF), and maternal grandfather (MGF).

MGGM claimed she was Alex's primary caregiver since mother stayed up all night and slept all day. Mother said she had not used methamphetamine in three weeks, but she tested positive for the drug on January 20, 2022.

Mother had one child, Alex, with Alex's father, D.G. (father).[3] Mother reported she and father had no relationship. There was no family law order in place, but father would pick up Alex to stay for three to four days a few times per month. During the initial interview with mother, there was concern she may have been under the influence of drugs, which she denied.

Mother acknowledged she and father engaged in domestic violence in Alex's presence. During the fight, Alex went to MGGM's room, because that was where he felt safe.

Mother reported a history of mental and emotional problems, including a potential diagnosis of bipolar disorder and suicidal ideations two or three years prior. Mother was connected to services but was not participating.

DCFS obtained an order to detain Alex from both parents. Alex was detained with MGGM and MGF, and mother left the home.

**Dependency petition and initial hearing**

On January 28, 2022, DCFS filed a petition on behalf of then six-year-old Alex, alleging the parents' domestic violence, mother's substance abuse, and mother's mental and emotional

---

[3]     Father is not a party to this appeal.

3

problems posed a substantial risk of harm to Alex under section 300, subdivisions (a) and (b)(1).

Both parents attended the detention hearing on February 2, 2022, and were appointed counsel. The court found a prima facie case was established and temporarily detained Alex from the custody of both parents. The court ordered visits and a mutual stay-away order for the parents.

**Alex's jurisdiction/disposition report and adjudication**

DCFS filed a jurisdiction/disposition report on March 9, 2022. Alex continued to live in MGGM's home, where he had been for a couple of years with MGGM caring for him. The parents did not have a set visitation schedule, but mother tried to visit Alex three or four times a week for three hours each visit. Alex confirmed the allegations against mother, describing physical altercations between his parents and confirming mother did not wake up during the day to care for him.

Father confirmed he and mother were no longer in a relationship and admitted past physical altercations.

At the March 9, 2022 combined adjudication and disposition hearing, mother waived her rights to a contested hearing. The juvenile court sustained amended counts regarding the parents' domestic violence, mother's substance abuse, and mother's mental and emotional problems.

The court declared Alex a dependent of the court, removed him from his parents' custody, and ordered family reunification services. Mother's visits remained monitored.

**Alex's status review and six-month review hearing**

DCFS filed a status review report on September 7, 2022. Alex continued to live with MGGM and MGF. MGGM initially said they were willing to adopt Alex, but later she and MGF told

4

the social worker they would rather become Alex's legal guardians to give mother a chance to complete her programs if reunification failed.  DCFS recommended legal guardianship with the caregivers as the concurrent permanency plan.

Alex had a strong attachment to his caregivers and was participating in weekly therapy.

Mother was not in compliance with her case plan and was not in consistent communication with DCFS.  She admitted to relapsing on methamphetamine two times and did not consistently submit to drug testing.

Mother visited Alex on Mondays, Wednesdays and Fridays, and MGGM monitored the visits.  MGGM said mother played with Alex, helped him with homework, and assisted him with bathing.  Alex and MGGM both reported mother fell asleep during the visits.  DCFS told MGGM to cancel the visits if mother fell asleep.

At the six-month review hearing, the court admonished the parents that their visits would be terminated if they were under the influence during a visit.  9/7/22 RT 6; 10)~ The court found the parents' progress was not substantial, but continued reunification services.

**Sophie's dependency petition, adjudication, and disposition**

On December 3, 2022, DCFS received a referral alleging mother gave birth to a baby girl who tested positive for methamphetamine at birth.

Mother told DCFS she used methamphetamine during her first and second trimesters and abused marijuana during her third trimester.  Mother reported having smoked marijuana a few

5

days prior to giving birth, and she believed the marijuana was laced with methamphetamine.

Mother reported two potential fathers, but she initially declined to provide their names. Sophie was placed with MGGM and MGF.

On December 8, 2022, DCFS filed a section 300 petition on behalf of Sophie, alleging she was described by section 300, subdivisions (b)(1) and (j) because she tested positive for methamphetamine at birth, mother continued to abuse substances, and mother continued to struggle with mental and emotional problems.

At the detention hearing, the juvenile court found a prima facie case that Sophie was described by section 300 and detained her from parental custody.

Mother enrolled in a residential treatment facility on December 13, 2022. It did not allow in-person visitation.

MGGM reported mother became combative, aggressive and violent after she started using drugs, that Alex was primarily raised by her, and Alex was attached to her because she was his primary caregiver. MGGM did not allow mother to take care of Alex when she was using drugs. MGGM said she knew when mother was still using drugs because of how she behaved. When mother visited, she could barely stay awake and was verbally aggressive.

MGGM initially told mother she would not care for Sophie. Mother said, "Who said that you are taking this baby?" and "I don't even want to have the baby; my focus is on getting Alex back with me." Ultimately, MGGM agreed to care for the baby after discussing it with DCFS. MGGM did not want to be the target of mother's abusive behavior anymore, so if mother did not

comply with court orders, MGGM wanted to move to an undisclosed location and keep the address confidential from mother.

Mother identified either father or "Chino" as possibly being Sophie's father. A DNA test ultimately ruled out father as Sophie's biological father. Despite a due diligence search, DCFS was unable to locate Chino due to the limited information it was given.

The court held the adjudication hearing for Sophie on March 7, 2023. The court found Sophie was a person described by section 300, subdivisions (b)(1) and (j) because she tested positive for methamphetamine at birth and due to mother's substance abuse and unresolved mental and emotional issues.

At the disposition hearing on April 20, 2023, the court removed Sophie from mother and ordered family reunification services. Mother was ordered to have monitored visits with Sophie three times per week for three hours per visit.

**Alex's 12-month review hearing**

Alex's 12-month review hearing also took place on March 7, 2023. Alex continued to do well in the home of MGGM, though he struggled in school and had increased negative behaviors since Sophie was placed in the home. His defiant behaviors were addressed in weekly therapy. The caregivers were willing to become Alex's legal guardians if reunification failed, and DCFS continued to recommend legal guardianship as the concurrent plan.

DCFS noted while mother had enrolled in an inpatient treatment program, she had not yet enrolled in individual counseling. It was also noted mother and father had violated the

court's stay-away order, as father was named as a possible biological father of Sophie.

MGGM reported mother's visits with Alex were consistent. She visited Mondays, Wednesdays, and Fridays for three hours. Mother played with Alex, helped with his homework, and assisted him with bathing; however, MGGM believed mother needed to learn how to discipline Alex because she spoke and argued with him like a friend. Alex had even slapped mother. After mother entered the inpatient facility, the visits continued on telephone and Facetime. Alex reported he missed mother.

At the hearing, the court continued reunification services for both parents.

**Review reports and 18-month review for Alex**

DCFS filed an interim review report on June 6, 2023. In March 2023, mother completed the inpatient program and was scheduled for intake at an outpatient program, but she was not admitted because she tested positive for alcohol. Mother reported having celebrated completing the inpatient program by having a few sips of a margarita. In May 2023, mother reported she had enrolled in an outpatient treatment program and had an intake appointment for individual counseling. Mother continued to be inconsistent with drug testing and communicating with DCFS.

Mother's counselor at the outpatient program reported mother was not in compliance with the program. Mother's counselor recommended she re-enroll in an inpatient program, but mother declined and did not return to the outpatient program.

Mother and father violated the stay-away order and were arrested on May 27, 2023, for fighting one another. According to

the police report, father identified mother as his girlfriend, and both parents reported mother drank before the altercation.

Mother continued to visit Alex regularly.  However, she spent considerable time on her cell phone during the visits.  Mother played with Alex, but did not assist with homework or the nighttime routine.  When MGGM asked for help, mother would become upset and make negative comments towards MGGM.

Alex continued to participate in weekly therapy, and his behaviors were de-escalating, though he continued to have outbursts.  Alex's sessions were reduced to bi-weekly in mid-July 2023 because of his improvement.

In a status review report filed on September 5, 2023, DCFS reported MGGM wanted to change her plan from legal guardianship with MGF to adoption with MGGF.  DCFS conducted a concurrent plan reassessment and recommended adoption with the maternal great-grandparents as the concurrent plan.

At the September 5, 2023 18-month review hearing for Alex, the juvenile court terminated reunification services for both parents and scheduled a permanency planning hearing pursuant to section 366.26.  Mother filed a notice of intent to file writ petition, but did not file a petition for extraordinary writ, so the writ was deemed nonoperative.

**Sophie's six-month review report and hearing**

DCFS filed a status review report for Sophie's case on October 19, 2023.  Mother was not in compliance with her case plan.  She had not enrolled in a substance abuse program or individual counseling, and her compliance with drug testing remained inconsistent.  Mother continued to visit on Mondays,

9

Wednesdays and Fridays for three hours. MGGM reported mother spent much of her time on her cell phone during the visits.

Sophie was doing well with her caregivers. MGGM and MGGF were willing to adopt Sophie if the parents failed to reunify. However, MGF was not in agreement with adoption. MGF preferred legal guardianship because he wanted mother to have a chance to reunify with the children. MGGM told DCFS if mother was "fine," mother could continue to see Sophie. However, MGGM wanted the children to have another life. DCFS recommended adoption by the maternal great-grandparents as the concurrent permanent plan.

At the review hearing on October 19, 2023, the juvenile court terminated mother's reunification services for Sophie and scheduled a section 366.26 permanency planning hearing.

**Permanency planning period**

On December 21, 2023, DCFS submitted a report for Alex's permanency hearing. Alex had completed his therapeutic services in August 2023, but another mental health assessment referral was submitted in November 2023 because the caregivers and the school reported behavioral concerns. MGGM and MGF were committed to adopting Alex, and DCFS was working to approve MGGF as a co-applicant.

Mother reported her visits were going well, though she sometimes missed visits because she had to work or participate in services. Alex reported his visits with mother were good.

DCFS recommended parental rights be terminated as to Alex, and the court continued Alex's section 366.26 hearing for an analysis pursuant to *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and to align Alex's and Sophie's permanency planning

hearings. The court also ordered DCFS to interview MGF and Alex about permanency options.

In a March 5, 2024 report, DCFS reported mother continued to visit Alex, who liked when mother cooked for him and when they listened to music and danced. Mother was attentive to Alex during visits. She helped him with bath time, homework, and prepared food for him. Alex missed his parents and wanted to be with them, but if that was not possible, he was happy with his caregivers.

Alex continued to struggle in school, and a tutoring referral was made. Alex continued to attend weekly therapy, and MGGM was working with DCFS to have him assessed for an individualized education plan.

MGGM said she and the other caregivers wanted to adopt Alex so they could provide him with a healthy environment and a permanent, stable home.

In April 2024, DCFS reported mother had issues with anger and threatened family members. MGGM suspected mother was using drugs and was concerned Alex was mirroring mother's behaviors. Alex's teacher said Alex struggled to take responsibility for his behaviors and lashed out at students who told on him.

Sophie, who was doing well and bonded with the caregivers, was referred to the Regional Center at MGGM's request.

The maternal great-grandparents and MGF continued to express their desire to adopt Alex and have full legal rights to him. Alex also said he wanted to be adopted by his caregivers because he loved them, and he knew he could not be returned to his parents. The three caregivers also wanted to adopt Sophie

11

and raise her with biological family in a supportive and stable environment. They had developed a secure bond and attachment to her.

Mother continued to visit consistently. If mother was unable to make a visit at a scheduled time, she would reschedule for the following day or the weekend. Mother spent more time with Alex, but she was slowly making progress at being more attentive to both children.

On March 6, 2024, the children's social worker reported mother smelled of alcohol on one of her visits with the children. When the social worker asked mother if she was under the influence, mother admitted to having a few drinks before coming to visit the children. The social worker discussed the importance of mother being sober during her visits, and mother stated she would do her best not to consume alcohol prior to the visits.

Alex was nine years old, and had been detained when he was six. He had been living in MGGM's home since before he was detained. Sophie lived with the caregivers since her birth and had developed a naturally secure and trusting bond with them.

MGGM reported mother's interactions with Alex were positive and healthy. Alex adored mother and enjoyed spending time with her. Sophie, too, appeared to be comfortable with mother. She allowed mother to hold her and play with her. Mother would shorten her visits when she had to go to work. Mother devoted time to bonding with Alex, but sometimes MGGM would have to tell mother what she needed to do to help with Alex's care. Alex would often play video games during mother's visits. As to Sophie, MGGM would tell mother what

help was needed in caring for the child. Mother continued to spend more time with Alex than with Sophie.

MGGM ensured Alex attended medical, dental, developmental, and mental health appointments. Alex knew mother was his mother, but he did not appear emotionally attached to mother at the end of visits. Sophie had no reaction at the end of mother's visits, but she would start crying whenever MGGM or MGF left the room. Sophie had started referring to MGGM as "mama."

Alex told DCFS he loved his parents and wanted them to be safe. He wanted to stay with MGGM and was fine with adoption because he knew he could not be with his parents. He knew if he stayed with MGGM, he would be able to see his parents. MGGM was willing to allow the parents to visit as long as they were sober.

Given the amount of time the children had spent with their caregivers, DCFS found it would not be detrimental for their relationships with their parents to be severed. Alex and Sophie both sought attention and comfort from the caregivers, even when mother was present. DCFS continued to recommend termination of parental rights as to both children.

On April 18, 2024, the juvenile court continued Alex and Sophie's section 366.26 hearing and ordered that a bonding study be conducted.

On June 13, 2024, DCFS reported mother had re-enrolled in Tarzana Treatment Center's outpatient program. She was inconsistent with drug and alcohol testing and was testing positive for alcohol and marijuana. Mother continued to visit consistently, and MGGM reported mother appeared sober and attentive during visits.

13

**The bonding study**

Nancy Kaser-Boyd, Ph.D., was appointed by the court under Evidence Code section 730 to conduct an evaluation of Alex, Sophie and mother.[4] Dr. Kaser-Boyd reviewed the case reports, and on June 10, 2024, she observed mother, Alex and Sophie's interactions in a private room together. She interviewed both mother and Alex, observed the children returning to MGGM, and observed the family having lunch together.

Dr. Kaser-Boyd observed mother appeared to be insightful and open to feedback. Mother reported she had been discharged from Tarzana Treatment Center's outpatient program because she was late for a class. She also reported she had been discharged from individual therapy in the past because she missed a session. Mother hoped the children could be returned to her but, if they could not, she was comfortable with the children remaining in their placement because MGGM told her she would not restrict visits between them.

Mother's interaction with the children was "attentive and warm." When mother picked up Sophie, she stopped crying. Sophie was in a great mood and was smiling and laughing in response to interactions with both Alex and mother.

Alex told Dr. Kaser-Boyd he did not like school anymore because there were tough kids who tried to fight with him every day, and he did not like to defend himself for fear of being accused of fighting. Alex said he liked living with his caregivers, but he loved his mother a lot. Soon after discussing his feelings

---

[4] Despite efforts from Dr. Kaser-Boyd and the court, father did not participate in the bonding study.

for mother, Alex moved closer to her on the couch. Mother said she felt bad for leaving him while she was in drug treatment.

Dr. Kaser-Boyd concluded the children were comfortable with and attached to mother. The children transitioned smoothly when MGGM returned and there was no tension between mother and MGGM. Dr. Kaser-Boyd noted the family got along well.

As to Alex, Dr. Kaser-Boyd opined he had a strong bond with mother and was likely to suffer emotional and mental harm if mother's parental relationship was severed.

As to Sophie, Dr. Kaser-Boyd noted she was quite attached to her caregivers since she had been with them since birth and, at the age of 17 months, did not comprehend that mother was her actual mother. Dr. Kaser-Boyd opined severing the parental relationship would "cause [Sophie] emotional/mental harm in the future and deprive Sophie of a substantial positive emotional attachment to her mother. This, of course, assumes that mother can maintain her sobriety." Dr. Kaser-Boyd noted MGGM was quite old, and it was hard to predict Sophie's caregivers would remain in good health throughout Sophie's childhood and adolescence, therefore it was in Sophie's best interest to "give mother a chance to find housing and stable work (or school) and the[n] consider returning Sophie to mother."

Dr. Kaser-Boyd did not believe the harm in severing the parental relationship for either child would be outweighed by the permanence afforded by their caretakers because the caretakers were older and the children were in their tender years, and because of the "universal desire by children to be loved by and raised by their own parent(s)." Dr. Kaser-Boyd noted that her conclusions "assume[d], of course, that the parent ha[d] reached a level of maturity and emotional stability to provide a secure

home." Dr. Kaser-Boyd felt that "[a]s a sober person, [mother] ha[d] many positive qualities, the most significant of which [was] her strong emotional connection to her children."

**Mother's section 388 petition**

On September 3, 2024, mother filed a section 388 petition requesting the children be returned to her care or, in the alternative, she be granted further reunification services and be allowed unmonitored visitation with the children. As to changed circumstances, mother stated she completed a substance abuse treatment program, addiction education, and parenting classes. Mother relied on Dr. Kaser-Boyd's assessment in arguing it would be in the children's best interests that her request be granted. The juvenile court set mother's section 388 petition for hearing.

DCFS provided a report addressing mother's section 388 petition. Sophie appeared to have a strong bond with the caregivers, and looked to them for comfort. When Alex was asked about his mother's request for custody of him, Alex gave a thumbs up and said, "[M]y mom's been trying for me." He wanted to live with mother. Alex expressed he would be sad if he could not live with mother, and he believed mother could take care of him and Sophie.

The dependency investigator (DI) made several attempts to interview mother about her section 388 petition. Several appointments were made with mother, but mother did not keep them. Mother disclosed she had been staying with a friend and did not provide a primary residence address.

MGGM expressed concern for mother's ability to care for Alex and Sophie because mother was barely able to care for herself and maintain sobriety. The caregivers did not believe

mother could care for the children on her own. MGGM hoped mother could reunify, but observed mother prioritized being with her friends and going to parties over working on herself and caring for her children. Although Alex was bonded to mother, MGGM reported they argued constantly during visits. MGGM did not believe mother tried to understand Alex's feelings and was more concerned about him respecting her. MGGM noted Alex witnessed many traumas before he was detained from mother due to mother's unhealthy relationships and substance abuse, and mother should consider that and try to understand Alex.

In addition, MGGM reported mother did not follow through when the children needed her. For example, on Friday, September 13, 2024, Alex was sick. On Sunday, MGGM called mother to ask her to come over to stay with Alex on Monday. Mother agreed, but did not arrive. MGGM said Alex constantly craved mother's attention, but when he called mother that Monday to see where she was, he did not get a response, even after repeated calls. MGGM reiterated that mother prioritized everyone but her children, and the children needed a parent that was present for their needs. Mother's participation in visits was inconsistent.

The caregivers reported mother and father continued to have contact despite the court-issued stay-away orders. MGGM reported approximately two weeks prior to the interview, both parents came to their home at 1:00 a.m. with pizza. MGGM told the parents to leave, and she would report the incident to the court. Mother said the court would not believe MGGM and threatened to take the children from her care. MGGM suspected mother may have been under the influence at the time. Mother

17

attempted to join father's visits and when MGGM did not allow it, mother became verbally aggressive with MGGM.

MGGM reported mother brought beer to their home and drank it. The caregivers did not ask her to get rid of the beer or end the visit because they wanted to avoid arguing with mother in front of the children. They noted mother was quickly offended when it came to visitation, and she acted as though she was never wrong. Also, they did not want to disappoint Alex because he enjoyed spending time with mother. The caregivers wanted the children and mother to remain bonded, but they were not confident in mother's ability to prioritize the children's safety.

MGGM believed the children would continue to do well if mother's petition were denied, as long as mother maintained contact with the children, especially Alex.

The social worker was concerned about mother's sobriety. Mother admitted drinking alcohol during one visit. The social worker believed the parents were in constant contact, and mother would give father unlimited access to the children if she reunified. The social worker was also concerned because mother displayed negative behavior towards MGGM during visits, and Alex copied these behaviors. They had to educate Alex that such behavior was not acceptable.

The DI who prepared the section 366.26 report indicated she had problems meeting with mother because mother kept rescheduling. When she finally met with mother, mother reported she had not consumed drugs for some time, but she relapsed on alcohol about a month earlier. Mother said she needed to learn to say no to her friends. Mother had initially claimed the visits were going well, but then admitted to inconsistent visits and said she needed to do better.

18

DCFS recommended the court deny mother's section 388 petition. Mother was not forthcoming about her housing situation and was not able to provide stable housing for the children. In addition, mother was not maintaining her sobriety and disregarded visitation rules. Mother's visitation had become inconsistent, and when she did visit, mother was on her cellphone or in the bathroom for long periods of time. Mother and Alex constantly argued during the visits. Alex was learning negative behaviors from mother and becoming disrespectful to MGGM.

DCFS remained concerned that mother and father continued to violate the stay-away order, including when they recently showed up at the placement at 1:00 a.m. together. DCFS suspected the parents were under the influence given the irrational nature of their actions. Mother had also requested to join father's visits and became upset when that was not allowed.

After hearing oral argument, the court denied mother's section 388 petition, finding mother had not showed changed circumstances or that her requests were in the best interests of the children.

**Section 366.26 hearing**

The section 366.26 hearing as to both children took place on December 10, 2024. The court admitted DCFS's documents into evidence and took judicial notice of the case file.

Mother testified. She said she was consistent with her visits, and if she could not attend a visit, she would call MGGM to reschedule. Alex referred to her as "Mom." Mother acknowledged Sophie called MGGM "mama" and that Sophie was more attached to her maternal great-grandparents. Mother was trying to approach Sophie more and bond more with Sophie.

19

During visits, mother made food for the children and did homework with Alex. She tried to play with Sophie and sing to Sophie because she did not want to ignore Sophie. She made sure both children showered. At the end of the visits, Alex would say he missed her and did not want her to leave.

Mother attended some of the children's medical and dental appointments, but more of Alex's than Sophie's. She was aware Sophie was receiving Regional Center services, but was not aware of the services Sophie was receiving, and had not made time to ask MGGM the details. Mother knew Alex took medication for an autoimmune disorder that caused blurred vision, but she did not know the medication. Alex had a doctor appointment the previous day, but mother could not attend because she had to work.

Mother said she called the children every day. She knew Alex was not doing well at school, and she had talked to him about it the previous day. She did not go to his parent-teacher conference because she was not allowed.

Mother's counsel asked the court to apply the beneficial parental relationship exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i) because mother had participated in consistent, regular, high-quality visitation with the children; had a strong bond with the children; and the detriment of severing the parental bond would not be outweighed by the benefit of permanency through adoption because of the age of the caregivers, as Dr. Kaser-Boyd opined. Counsel urged the court not to consider terminating the parental bond as to one child, but not the other, due to the sibling bond. Counsel also argued the court should ignore Dr. Kaser-Boyd's qualification to her opinion that severing the parental relationship would be

20

detrimental to the children assuming mother maintained her sobriety. He argued any evidence mother may have relapsed had no impact on her bond with the children. He requested the court order a permanent plan of legal guardianship.

The children's counsel agreed with DCFS's recommendation to terminate parental rights. He argued the beneficial parental relationship exception did not apply. Recently, mother's visits had not been consistent, and they had not always been appropriate. While Alex had a strong bond with mother, a permanent home would be more beneficial because over the last three years Alex had been let down by mother failing to follow through for him. Dr. Kaser-Boyd's opinion regarding the effect of the caregivers' age was speculative. He asked the court to proceed with adoption for both children.

DCFS's counsel also argued mother had not met her burden to show the beneficial parental relationship exception applied. Mother's recent inconsistency in visitation could be attributed to her relapse into alcohol use. Mother's struggles with sobriety impacted her relationship with her children. Mother did not take the time to understand how her actions had impacted Alex and failed to follow through when she told him she would. Mother's behavior created tension in the placement and negatively impacted Alex. Counsel argued the benefit of a permanent home outweighed the benefit of any parental bond with the children. As to the bonding study, DCFS argued Dr. Kaser-Boyd's focus on the age of the caregivers was not an appropriate consideration for the court. In sum, DCFS argued mother had not met her burden to show the second or third prong of the beneficial parental relationship exception and urged the court to terminate parental rights.

The juvenile court found, despite mother's recent inconsistency, she had maintained regular and consistent visitation.

As to the bond, the court found Alex had a bond with mother, but there was a "theme of disappointment and instability" in their relationship, which caused Alex to crave mother's attention and led the caregivers to overlook mother's negative behaviors, such as showing up under the influence, leaving him disappointed, and having inconsistent visits. The court found mother's choices impacted Alex in a negative manner, causing him to mimic her behavior toward the caregiver. In addition, mother did not have insight into how her behavior had affected Alex, and she did not try to understand his perspective.

The court found: "[Mother's] actions have impacted the bond, have harmed the bond, and so when the court is looking at today whether [mother] has—whether parents have proved by a preponderance of the evidence that this is a benefit—beneficial and nurturing relationship and that it would be detrimental to sever that relationship, the court can't find that. Instead, the court is finding that the stability and consistency that the new adoptive home outweighs the terminating of parental rights."

As to Alex, the court found "there is a pattern of behavior by parents that is negatively impacting their bond with the child, negatively impacting the child, period."

The analysis for Sophie was not as complex. The court noted mother admitted she was building a bond with Sophie, but the bonded relationship was "not there because of how long she's been out of [mother's] care and custody." Particularly because Sophie was a Regional Center client, the court placed greater

22

weight on the child's need for consistency and stability that a new adoptive home would offer.

The juvenile court found the children were adoptable and the beneficial parental relationship exception had not been established. The court terminated parental rights for both children.

On December 10, 2024, mother filed a notice of appeal.[5]

## DISCUSSION

### I. Applicable law

At a section 366.26 hearing, the trial court is required to select and implement a permanent plan for the dependent child. (§ 366.26, subd. (b).) If the child is likely to be adopted, adoption is the preferred permanent plan. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.) Once a finding of adoptability is made, the juvenile court "shall terminate parental rights and order the child placed for adoption" unless one of the statutory exceptions to the preference for adoption is met. (§ 366.26, subd. (c)(1)(A)–(B).)

Section 366.26, subdivision (c)(1)(B)(i) is the beneficial parental relationship exception to the termination of parental rights. It requires a parent to establish, by a preponderance of the evidence, three elements: (1) regular visitation and contact with the child; (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th

---

[5] Mother appealed from both the denial of her section 388 petition and the termination of her parental rights. However, mother does not challenge the denial of her section 388 petition and only challenges the orders terminating her parental rights.

23

at p. 631.)  In assessing whether termination would be detrimental, the trial court must consider whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  (*Id.* at p. 632.)  "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests."  (*Ibid.*)

The first two elements of the beneficial parental relationship exception to termination of parental rights are factual determinations, reviewed under the substantial evidence standard.  (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)

The third element involves a "delicate balancing" of the factual determinations made in assessing the first two elements.  (*Caden C., supra*, 11 Cal.5th at p. 640.)  "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary, and properly reviewed for abuse of discretion."  (*Ibid.*)

In reviewing the factual determinations of the juvenile court, we may not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  (*Caden C., supra*, 11 Cal.5th at p. 640.)  The juvenile court's factual determinations should be upheld if supported by substantial evidence, even if contrary evidence exists and the trial court might have reached a different result had it believed other evidence.  (*Ibid.*)  Under the abuse of discretion standard of review, we uphold the court's decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.  (*Id.* at p. 641.)

24

Where, as here, the appealing party had the burden of proof below and failed to meet it, we review the evidence to determine if it compels a finding in the appellant's favor as a matter of law.[6] (*In re M.V.* (2025) 109 Cal.App.5th 486, 508.)

## II. The juvenile court did not err in conducting its analysis under *Caden C.*

Mother's primary argument is the juvenile court erred in denying she established the beneficial parental relationship exception because the court relied on matters the *Caden C.* court found to be legally irrelevant. For the reasons set forth below, we disagree.

### A. Caden C. *factors*

The *Caden C.* court recognized that, having reached the permanency planning hearing, the parent has been unsuccessful in meeting the goals of reunification. (*Caden C., supra*, 11 Cal.5th at p. 637.) Thus, a parent's struggles with the issues that led to the dependency are not relevant simply because they might conceivably affect the parent's ability to regain custody of the child. (*Id.* at p. 638.) "If termination of parental rights would, when weighed against the offsetting benefits of an adoptive home, be detrimental to the child, the court should not terminate parental rights, even if the parent has not demonstrated a likelihood that he or she will ever be able to regain custody."

---

[6]    The cases mother cites do not support her contention that DCFS bore the burden of proof on the narrow issue of whether mother's failures preventing reunification impacted the parent-child bonds. (See *Caden C., supra*, 11 Cal.5th at p. 639; *In re Dy.P.* (2022) 76 Cal.App.5th 153, 168; *In re J.D.* (2021) 70 Cal.App.5th 833, 863.) We therefore decline to apply this burden of proof.

25

(*Ibid.*)  However, the *Caden C.* court agreed that "[i]ssues such as those that led to dependency often prove relevant to the application of the exception."  (*Id.* at p. 637.)  The parent's struggles with issues such as those that led to the dependency are relevant "only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?"  (*Id.* at p. 638.)[7]  However, the *Caden C.* court recognized "how and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions not always answered just by determining how beneficial the child's relationship with the parent is."  (*Id.* at p. 639.)  "[A] parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental."  (*Ibid.*)

## B.  *The court's analysis*

In performing the *Caden C.* analysis, the court recognized "this is a fairly involved *Caden C.* analysis."  In addition, the court noted "the *Caden C.* analysis changed in this case fairly substantially after the court received the 388 report."[8]

_____

[7]     The *Caden C.* court made it clear we must assume the parent-child relationship will be severed.  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633.)

[8]     Mother did not object to the court's reliance on the section 388 report at the time of the hearing.  Mother now argues the court erroneously relied on the section 388 report as that report

As to the first element of the analysis, the court said "both parents have shown regular and consistent visitation, albeit [mother] admits to a lack of consistency more recently. For the purposes of the *Caden C.* analysis, however, I think the meat of the issues are in prongs 2 and 3."

The court noted there were some inappropriate factors mentioned in Dr. Kaser-Boyd's bonding study, such as the age of the caregivers. In addition, the court pointed out Dr. Kaser-Boyd indicated some of her opinions would be impacted by mother being able to maintain her sobriety, which had become an issue recently, with mother admitting to drinking alcohol.

The court noted it could not use mother's "recent relapse as the primary factor" but that it could be "considered in the larger context of impact on the parent-child bond." The court found Alex had a bond with mother, but Sophie had less of a bond because she was detained so soon after her birth. The court then stated, "If the parents continue to struggle with issues that led to the dependency case, they have to be analyzed in the context of whether those are impacting the parent-child bond and the relationship." The court found in this case mother's actions were "still relevant to the *Caden C.* analysis" because those actions

---

was focused on reunification or return—outcomes that could not be considered at the permanency planning hearing. Mother presents no legal basis for this argument, and we reject it. The juvenile court was permitted to consider all of the reports, regardless of the purpose for which they were created, in evaluating the parent-child relationship. (*Caden C., supra*, 11 Cal.5th at p. 637 [noting issues that led to the dependency are often relevant to the application of the beneficial parental relationship exception].)

were "impacting [her] quality time with the child, [her] bonding with the child."

As examples of the impact mother's behaviors had on Alex, the court discussed a "theme of disappointment and instability," highlighting the incident when Alex was sick, and mother agreed to be there for him. Alex "call[ed] [mother] over and over again because he's sick and wanting his mom's attention and [mother] was unable to respond." In addition, mother's visitations had become inconsistent. The court commented mother's excuse that work was the reason her visits were impacted did "not ring true."

The court described the dynamic that had evolved between Alex and mother. Alex was craving mother's attention and affection, causing the caregivers to overlook mother's behaviors such as bringing alcohol to a visit and coming to the home at 1:00 in the morning under the influence. For these reasons, the court believed mother's choices were detrimental to Alex.[9]

Further, the court noted mother had treated the caregiver "in a 'harsh way,'" and Alex was mimicking that behavior.

---

[9] Mother makes much of the fact that there was no evidence the children were aware of the parents' arrival at the home at 1:00 a.m. Thus, mother argues, the incident could not possibly have affected the parental bond. However, the incident highlights mother's pattern of disregarding the visitation rules and berating MGGM when MGGM tried to enforce the rules. Thus, regardless of whether the children were aware of the incident, it was reasonable for the court to conclude mother's actions negatively impacted the children by creating discord in the home and leaving the caregivers in a position where they were forced to make difficult decisions regarding the children's wellbeing.

The court found "the actions of the parents are causing emotional dysregulation by disappointing Alex, by not being consistent, by bringing beer to the visit, by showing up at the placement at 1:00 a.m. and threatening to take the children away." "[Mother's] actions have impacted the bond, have harmed the bond, and so when the court is looking at today whether [mother] has . . . proved by a preponderance of the evidence that this is a . . . beneficial and nurturing relationship and that it would be detrimental to sever that relationship, the court can't find that." Instead, the court found the stability and consistency that the new adoptive home provided outweighed the termination of the parental relationship.

As to Sophie, the court found there was no bond, noting mother admitted she was in the process of building the bond with Sophie.

Thus, despite the parents' objections, the court proceeded with termination of parental rights.

## C. *The juvenile court did not apply a fault-based analysis*

Mother takes issue with each of the facts the juvenile court relied upon in denying the beneficial parental relationship exception to termination of parental rights.[10]

Regarding the court's reference to a "theme" of disappointment and instability, mother argues the court referenced only one example of this—the time Alex was sick and

---

[10] Because the juvenile court found mother did not have a significant bond with Sophie, this discussion focuses mainly on the juvenile court's analysis of mother's relationship with Alex and whether termination of that relationship would be detrimental to Alex.

29

could not reach mother despite her promise to be there for him. Mother argues the court ignored Alex's feelings indicating mother was "trying for [him]" and he would be sad not to be in mother's care. Mother argues DCFS made no showing that single experience changed Alex's case-long reported positive bond with mother.

Other evidence in the record supported the juvenile court's determination that the relationship carried a theme of disappointment and instability. MGGM reported mother prioritized everyone but her children and did not follow through when given the opportunity to be a parent to her children. Mother's visits had become inconsistent, and the court attributed the recent inconsistency to mother's relapse, finding her work excuse to be not credible. Mother's inconsistency was greater after she filed her section 388 petition. Although Alex was interviewed about the possibility of returning to mother, mother failed to participate in an interview, rescheduling several times and ultimately oversleeping for her appointment with the DI. These behaviors on mother's part were not simply the court placing blame on mother. Instead, the court specifically tied these behaviors to their negative impact on Alex.

The court also discussed the negative impacts of mother's inconsistency. Alex craved mother's attention and affection, and the court expressed concern that this led the caregivers to overlook safety issues concerning mother's visits. Mother argues there was no evidence the caregivers' lapses of enforcement of the visitation rules affected the children's bond with mother. Mother ignores the caregivers' testimony that mother displayed negative behavior towards the caregiver when she tried to enforce the rules, using harsh language and threatening the caregiver. Alex

had begun to mimic those behaviors and was becoming disrespectful to MGGM. Mother's behavior also led to mother and Alex arguing constantly during the visits. MGGM opined mother did not try to understand Alex's feelings but was more focused on Alex respecting her. The court specifically addressed these prominent examples of how mother's issues were affecting her bond with her children.

Mother's disagreements with the court's factual determinations as to the impact of her behaviors on the children are not well taken. Under the substantial evidence standard of review, "[t]he judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Substantial evidence supported the juvenile court's factual determinations as to the negative impacts of mother's actions on her relationship with the children, especially Alex.

As to the "delicate balancing" of the factual determinations made by the juvenile court, we find no abuse of discretion. (*Caden C., supra*, 11 Cal.5th at p. 640.) The juvenile court was precise in its analysis, specifically tying mother's struggles with the issues that led to the dependency to the question of whether the children would benefit from continuing the relationship. The court recognized the complex task before it in this case and, after weighing the evidence carefully, found mother's struggles were directly relevant to its analysis in deciding termination would not be detrimental to the children. The evidence supported the juvenile court's decision, and no violation of the requirements of *Caden C.* occurred.

## III. The juvenile court did not err in selecting adoption over legal guardianship

Mother argues the basis the juvenile court presented for recommending permanency by adoption instead of legal guardianship was legally infirm and not child focused. While acknowledging the Legislature's preference for adoption, mother argues the preference is overridden if one of the section's exceptions is found to apply. Mother points out MGF and maternal uncle expressed their wishes that mother be allowed to stabilize and rehabilitate to be allowed to take custody of the children. All caregivers consistently emphasized the importance of mother's visits to the children. In later reports, DCFS reported the choice of adoption as the permanent plan was causing tension among the prospective caregivers. According to mother, the reason the court gave for choosing adoption over legal guardianship was that it had a lesser rate of failure than legal guardianship as a permanent plan. Mother points out section 366.26, subdivision (c)(1)(A) permits a court to elect guardianship as the permanent plan instead of adoption when a relative is unwilling to adopt for other than financial reasons, but is willing to accept legal guardianship and the removal of the child from the custody of the relative would be detrimental to the emotional well-being of the child.[11]

Section 366.26, subdivision (c)(1)(A) does not apply because the caregivers in this case were willing to adopt Alex and Sophie. While MGGM initially desired legal guardianship, she changed

---

[11] Mother fails to point to a citation in the record showing she raised this provision in the trial court. Mother is not permitted to change her theory on appeal. (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.)

her mind and did not waver on her decision to adopt the children once she had decided to do so.  The tension in the home regarding the disagreements as to the best plan for permanency do not render section 366.26, subdivision (c)(1)(A) applicable and do not undermine the juvenile court's decision to comply with the Legislature's stated preference and choose adoption as a permanent plan for Alex and Sophie.

Mother argues the evidence created an inference that DCFS threatened the caregivers with removal of the children if they did not agree to adoption and that DCFS did not inform the caregivers that legal guardianship was an option.  The record does not support mother's interpretation.  The record shows DCFS first recommended legal guardianship as the permanent plan.  However, the plan changed to adoption after MGGM requested the change.  The record shows DCFS discussed the various permanency options with the caregivers on numerous occasions.  There is simply no evidence in the record that DCFS threatened the caregivers with removal if they did not agree to adoption.  Nor did mother draw the juvenile court's attention to any such evidence so the juvenile court could address it in the first instance.  Thus, the issue is forfeited on appeal.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686 ["A party may not assert theories on appeal which were not raised in the trial court."].)

It is well settled that adoption is the permanent plan preferred by the Legislature.  (*In re Tabatha G., supra*, 45 Cal.App.4th at p. 1164.)  Regardless of the rationale articulated by the juvenile court, the court followed the statutory mandates in carrying out its obligations under section 366.26 and choosing

adoption as the permanent plan for the children.  No error occurred.

## **DISPOSITION**

The orders are affirmed.


CHAVEZ, J.

We concur:


LUI, P. J.


RICHARDSON, J.